**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| In re:<br><br>JASON DEAN CLARK,<br><br>    Debtor. | Case No. 21-16109 KHT<br>Chapter 7 |
| DAVID E. LEWIS, Chapter 7 Trustee,<br><br>    Plaintiff,<br><br>v.<br><br>LAW OFFICES OF AMBER FLORIO,<br>PLLC, and COMMONWEALTH<br>SERVICING GROUP, LLC,<br><br>    Defendants. | Adversary No. 22-01166 KHT |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

THIS MATTER came before the Court after trial on the Amended Complaint filed by David E. Lewis, Chapter 7 Trustee ("Trustee"), following which the matter was taken under advisement. The Court is now prepared to rule and hereby finds and concludes as follows:

## I.    JURISDICTION AND VENUE

This Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 1334(b) and 157(a). Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409.

At the times the complaint was filed, the amended complaint was filed, and all pre-trial proceedings took place, the proceeding was fundamentally a core proceeding under 28 U.S.C. §§ 157(b)(2)(H) because it sought to determine, avoid, or recover a fraudulent conveyance. At the beginning of the trial, Trustee voluntarily dismissed his fraudulent conveyance claims, leaving only his claim based on the Colorado Uniform Debt Management Services Act, Colo. Rev. Stat. § 5-19-201 *et seq*. The Court did not lose jurisdiction over the proceeding as a result of Trustee's day-of-trial dismissal of the fraudulent conveyance claims. *See, e.g., Freeport-McMoRan, Inc. v. K N Energy, Inc.*, 498 U.S. 426, 428 (1991) ("[I]f jurisdiction exists at the time an action is commenced, such jurisdiction may not be divested by subsequent events.").

In the alternative, the Court has "related to" jurisdiction under 28 U.S.C. § 1334(b)

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 22-01166 KHT

because the outcome of the proceeding could conceivably have an effect on the estate. *See, e.g., In re Pacor, Inc.*, 743 F.2d 984, 994 (3d Cir. 1984). All parties consented to this Court's entry of final orders. *See* Amended Complaint (docket #43) at 1, ¶ 5; Answer of Defendant Law Offices of Amber Florio, PLLC (docket #46) at 2, ¶ 5; Answer of Defendant Commonwealth Servicing Group, LLC (docket #48) at 2, ¶ 5.

## II.    FINDINGS OF FACT

### A.    Commonwealth Law.

In 2015, attorneys Thomas Rogus and Amber Florio formed The Law Offices of Amber Florio, PLLC d/b/a Commonwealth Law Group ("Commonwealth Law"), a Texas professional limited liability company, to provide debt-management services to customers in multiple states. Mr. Rogus was primarily responsible for Commonwealth Law's day-to-day operations, while Ms. Florio's role was more limited. Mr. Rogus and Ms. Florio were Class A members of Commonwealth Law. Mr. Rogus owned approximately 97% of Commonwealth Law, and Ms. Florio owned approximately 3%. The remaining ownership was divided among Class B members, who were attorneys admitted to practice in the states in which Commonwealth Law operated. Mr. Rogus estimated Commonwealth Law had approximately 40 Class B members.

Attorneys Mark Scheer and Kevin Wang were admitted to practice in Colorado. In 2015 or 2016, each entered into an Attorney Class B Unit Acquisition and Services Agreement (a "Class B Agreement"), pursuant to which Commonwealth Law issued each attorney one Class B Unit, representing 0.1% of the company's equity. Included with the Class B Agreement was a Schedule of Fees setting forth the following payments for the following services:

| Service | Fee |
|---|---|
| Attorney-Client Consultation Call (new clients) | $65.00 |
| Signing post-Attorney-Client Consultation Call letter | $5.00 |
| Settlement review | $10.00 |
| Quarterly file review | $10.00 |
| Annual call with client | $40.00 |

When a client retained Commonwealth Law to perform debt-management services, a Retainer Agreement was prepared, setting forth the specific debts enrolled in the program, the services to be performed, and the fees to be charged, which in this case included a retainer fee (described as a cost of certain legal services) and a service cost (calculated as a percentage of the debt at the time of enrollment). The client made regular payments into a dedicated account managed by a third party, Global Client Services. Commonwealth Law's non-attorney negotiators, who worked out of an office in Massachusetts, contacted the client's creditors in efforts to reach settlements of the client's debts. After a settlement was obtained by a negotiator, approved by an attorney admitted to practice in the client's home state, and authorized by the client, the settlement funds and Commonwealth Law's fees would be removed from the dedicated account and applied to the settlement and applicable fees.

At its peak, Commonwealth Law employed approximately ten negotiators. By the time of trial, Commonwealth Law was in the process of winding down its operations. It accepted its last client in 2021. Mr. Rogus estimated Commonwealth Law had 24 Colorado clients who were still making payments on their debts through the program. While Commonwealth Law operated, it had "a few hundred" clients in Colorado.

### B.      Commonwealth Servicing.

Commonwealth Servicing Group, LLC ("Commonwealth Servicing") was a Massachusetts limited liability company formed in approximately 2015. Its members were Dan Kwaitek, Matthew Guthrie, and John Caron, and their ownership interests were equally divided.

Commonwealth Servicing provided services to Commonwealth Law's clients, in exchange for approximately 99% of the settlement fee paid to Commonwealth Law. Commonwealth's witnesses described the services performed as administrative, non-legal, support staff services, including client enrollment, client support, client fee accounting, general administrative support, and payment processor support.

Employees of Commonwealth Servicing worked out of the same Massachusetts office as the employees of Commonwealth Law. Employees of Commonwealth Law and employees of Commonwealth Servicing used email addresses ending in CommonwealthServicing.com.

At its peak, Commonwealth Servicing employed 15-20 customer service representatives. By the time of trial, Commonwealth Servicing was also in the process of winding down, and only two employees remained.

### C.      Debtor Jason Dean Clark.

By September 2019, Colorado resident Jason Dean Clark, who had experienced medical issues and periods of unemployment, had accumulated a substantial amount of credit card debt, as follows:

| Creditor | Balance |
|---|---|
| Capital One | $19,942.00 |
| American Express | $15,708.00 |
| Citi | $13,912.00 |
| Synchrony Bank/Gap | $2,711.00 |
| PayPal | $3,580.00 |
| **Total:** | **$55,153.00** |

Commonwealth Law accepted leads generated by sales companies who conducted marketing activities. One such sales company, Lendah, employed Richard Minton as a salesperson. Mr. Minton was the salesperson assigned to Mr. Clark.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 22-01166 KHT

Commonwealth Law used LeadTrac, a database program owned and operated by National Data Systems, which program was customized for Commonwealth Law's business. LeadTrac allowed program users to upload files and to review and update information. It appears Mr. Minton (username "lglenrminton") created or provided the initial information for Mr. Clark's LeadTrac file. The LeadTrac data indicates Mr. Minton had an appointment with Mr. Clark on September 19, 2019.[1]

At that time, when a prospective client desired to retain Commonwealth Law, the firm sent a non-attorney notary to provide an in-person, face-to-face presentation to the client and to ensure the firm's documents are properly executed. The notary read a specific script and presented a PowerPoint presentation to the client. The notary was not authorized to answer any questions the client may have; instead, the notary was to direct the client to the script or to a Commonwealth Law representative. In Mr. Clark's case, Commonwealth Law used Sunshine Signing Connection as the notary. Commonwealth Law paid Sunshine Signing Connection $110 for its services.

The notary (in this case, Kirk Sander) met with Mr. Clark on September 24, 2019, and presented Mr. Clark with the documents that had been uploaded in LeadTrac by Mr. Minton, including a Retainer Agreement, a Dedicated Account Agreement, and a Power of Attorney permitting Commonwealth to act on Mr. Clark's behalf. The Retainer Agreement provided, in relevant part, as follows:

> This document is a legally binding agreement confirming that you ("Client") and Law offices of Amber Florio, PLLC d/b/a The Commonwealth Law Group ("Commonwealth") wish to form an Attorney/Client relationship.

> Pursuant to this Agreement's terms, Commonwealth will assist you with the resolution of burdensome debt, and as such, the Representation contemplated in this Agreement is referred to as a Debt Resolution Program. In return for Commonwealth's services, you agree to pay specific amounts to Commonwealth, as specified in this Agreement and its enclosures.

> Client is retaining Commonwealth to help resolve specific debts that Client cannot reasonably satisfy according to existing terms. These specific debts are listed in this Agreement.

---

[1] Commonwealth produced the LeadTrac data in discovery, both in native format and exported into Excel spreadsheets. One spreadsheet was admitted as Defendants' Exhibit S-1. The spreadsheets were also identified in several depositions and were discussed in each deposition designated (Dan Kwiatek deposition exhibit 1, identified at page 31; Kevin Wang deposition exhibit 1, identified at page 57; Mark Scheer deposition exhibit 5, identified at page 25; Salvador Pena deposition exhibit 1, discussed at pages 26-29; Thomas Rogus deposition exhibit 1, identified at pages 13-17). The Court finds the LeadTrac data to be the most credible evidence of what Commonwealth representatives did or said during the relevant time periods. Given Commonwealth's high-volume practice, it would be unlikely any one representative would recall an action taken, an email exchange, or a phone call even a week or two after it occurred, much less four to six years later. The Commonwealth representatives who testified in depositions and in court had no memory of what happened in relation to Mr. Clark's matters.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 22-01166 KHT

Retainer Agreement (Exhibit 1) at 2.

The Retainer Agreement set forth Mr. Clark's debts, as outlined above. The Retainer Agreement provided Mr. Clark would make payments of $906.90 per month for an estimated 48 months, totaling $43,530.75, with the first payment due October 15, 2019. The Retainer Agreement further provided Mr. Clark's "Law Firm Contact" was Mr. Minton. Retainer Agreement at 3. The Retainer Agreement set forth the following services to be provided:

Commonwealth's services are performed by a group of professionals, including attorneys, paralegals, negotiators, assistants, and others. Attorneys directly supervise the activities they do not directly perform. Commonwealth will perform the various services described in this section.

**1.1. Debt Analysis**
Commonwealth will review Client's personal hardship and other debt circumstances and formulate a plan to negotiate improved terms.

**1.2. Negotiate and Resolve Client Debt**
Commonwealth will represent Client in the negotiation and resolution of unsecured debts listed in the Creditor List enclosed with this Agreement. Representation related to any debt is governed by the promises and limitations discussed throughout this Agreement.

**1.3. Litigation Defense Services**
Commonwealth will advise and represent Client in their defense of litigation initiated by creditors or collectors to recover debts listed in this Agreement. Commonwealth attorneys are immediately notified of litigation, and may be assigned to address any litigation served on Client after the effective date of this Agreement. Litigation services are further conditioned and limited by other terms of this Agreement, circumstances of practicality, and jurisdictional rules.

**1.4. Services Outside Scope of Representation**
Commonwealth's services are limited to those specifically listed above. This means that Commonwealth will not provide accounting, financial planning, or tax advice. Commonwealth does not engage in credit repair or credit reporting. Commonwealth does not attempt to resolve debts on which a judgment has been obtained. Bankruptcy services, and defense or prosecution of any debt not listed in this Agreement are outside the scope of representation. Further, Commonwealth cannot guarantee that creditor or collector harassment will cease at any point in the representation. However, under some circumstances, Commonwealth may take appropriate legal action against creditors or collectors engaged in illegal activity.

5

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 22-01166 KHT

### 1.5. Work Performed by Contracted Parties

Commonwealth may contract work relating to this Agreement to third parties for such tasks including, but not limited to customer service and debt negotiations. Commonwealth attorney will supervise all third-party entities to ensure contracted services comply with Commonwealth's rules and regulations.

### 1.6 Litigation Defense Services

Creditors and/or debt collectors may file lawsuit(s) against Client in order to collect non-payment of owed debt(s). Commonwealth will provide Litigation Defense Services in the event the client receives a Summons and Complaint. The Litigation Defense Services will include work done in court and/or negotiations out of court. . . .

. . . .

Retainer Agreement at 4-5.

The Retainer Agreement provided for the following fees and costs:

Commonwealth's fees are payable according to the following terms. No fees are collected by Commonwealth until those fees were earned through settlement of client's respective debts.

### 2.1. Service Cost - Related services

The Retainer Fee is $1,650. This fee covers the initial work performed by attorneys in crafting and reviewing your specific debt negotiation plan, as well as their continued legal work in securing or approving settlements, counseling you on the phone, providing litigation services, and any other legal task your circumstances require.

In addition to the legal services provided by Commonwealth, there are non-legal services related to the implementation, management and maintenance of Client's debt negotiation plan performed under the supervision of Commonwealth's attorneys. These services are provided at a cost equal to 25% of the Client's total scheduled debt (hereinafter referred to as Service Cost).

Commonwealth has a non-exclusive reciprocal referral agreement with independent contractors to provide non-legal services under Commonwealth's direct supervision. Representatives of such independent contractors cannot and will not provide any legal advice to the Client, and any such advice will only be communicated to Client by Commonwealth. Although these services are performed under Commonwealth's supervision, a court or courts might determine that there is no attorney-client relationship between Client and the independent contractor representatives in regard to these services, and communications between Client and the

6

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 22-01166 KHT

independent contractor representatives might not be protected by attorney-client privilege.

Together, the Retainer Fee and Service Cost equal $1650 plus 25% of the total amount of debt you enroll in the Commonwealth program. The estimated total fees for Commonwealth's Services are $15,438.25 including the Retainer Fee and Service Cost.

## 2.2. Program Details

Total Unsecured Debt: $55,153.00          Est. Program Length (months): 48

Date of First Payment: 10/15/2019          Monthly Payment Amount: $906.90

Estimated Total Payments: $43,530.75          Estimated Total Fees: $15,438.25

The estimates provided above are just that - good faith estimates. The actual results vary on a case by case basis. In addition, the accuracy of these estimates is dependent on the accuracy of the information that you provide, the terms of the settlements we are able to negotiate with your creditors and on your ability to save a consistent amount each month.

## 2.3. When and How Commonwealth's Fees are Paid

We do not charge any fee for our Debt Resolution services unless and until a Debt is successfully resolved. Our fee is due upon the occurrence of all of the following: 1) we negotiate, either through our own effort or as a result of our debt resolution strategy, the settlement of a Debt, 2) you agree to the terms of the settlement, and 3) you make a payment toward the settlement of the Debt (unless the terms of the settlement require no payment by you, in which case we would still be entitled to receive our fee for resolving that Debt). We will charge the proportionate share of the Retainer Fee for that Debt (based on the enrolled amount of the Debt) and 25% of the enrolled amount of the Debt on the Effective Date as reflected in the attached Creditor Listing, subject to any modifications which may occur as discussed in Sections 2.9 and/or 2.10.

A.    Although the settlement offers we negotiate, either through our own efforts or as a result of our debt management strategy, may have terms that require a single payment (for example, a $1,500 lump sum payment to settle a $4,000 debt) or that require a number of payments (for example, payments of $500 per month for eight months to settle a $10,000 debt), our fee for the settlement of any Debt is earned, and is charged in full, at the time you make the first payment to a Creditor on an agreed-upon settlement of that Debt.

B.    We will present you with a settlement offer once you have accumulated sufficient funds in your Dedicated Account to

7

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 22-01166 KHT

pay both the negotiated amount of the settlement and our fee associated with that Debt. Our fees, once earned, will be paid to us by your dedicated account provider based on your authorization in this Agreement.

**2.4. Application of Client Funds**
All funds paid by Client will be saved in Client's Dedicated Account that is owned by Client and held by a third party dedicated account holder (See Dedicated Account Agreement) for use in making payment toward any settlement negotiated and paying Commonwealth's fees under the terms of this Agreement.

All funds in Client's Dedicated Account shall remain under Client's control at all times, and may be withdrawn by Client at any time without penalty. If Client notifies Commonwealth or the third party dedicated account holder of a request to withdraw their fund, Client shall be entitled to receive all funds in the Dedicated Account, other than any funds that have previously been earned by Commonwealth under the terms of this Agreement, within seven (7) business days of such request.

It is strongly recommended that Client retain all funds available for settlement payment and fees to allow Commonwealth the greatest ability to effectively represent Client under the terms of this Agreement.

Retainer Agreement at 7-8.

Finally, the Retainer Agreement provided the following "Additional Disclosures & Disclaimers":

a.    There are other remedies/solutions available for clients to relieve themselves of their debt burdens. Those remedies include bankruptcy and consumer credit counseling. (See Exhibit A of this Agreement for further information).

b.    Declaring bankruptcy may discharge or allow a court-imposed repayment plan for the majority of Client's debts. However, this will be reflected as a permanent record on a Client's credit report for up to 10 years. Commonwealth will discuss and advise Client as to the bankruptcy option, including fees and costs, at any time that Client's circumstances change or Client requests such consultation. There are no additional fees required from Client for such consultation and preliminary advice regarding bankruptcy.

Retainer Agreement at 14. The Exhibit A referenced on page 14 states, in relevant part, as follows:

8

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 22-01166 KHT

**Bankruptcy and Debt Negotiation**
Commonwealth is a full-service debt resolution law firm which provides services including debt negotiation and restructuring and bankruptcy services. The following provides information about these approaches to debt resolution for your review. Clients should fully understand the advantages and disadvantages of each to make an informed decision.

**Bankruptcy**
Bankruptcy will usually discharge your unsecured debt and your creditors are not permitted to contact you once you have filed with the court. There are two kinds of bankruptcy: Chapter 13 bankruptcy where you are generally able to keep property that is mortgaged , such as your house or car, and are expected to repay debts in three to five years, and Chapter 7 bankruptcy where you must give up all non-exempt property and assets that you own in exchange for a discharge of most debt. Bankruptcy may be appropriate if you have pending foreclosures, collection litigation or wage garnishments; however, you may have issues in reestablishing credit for up to ten years. In 2005, the bankruptcy law was changed to make it more difficult for some consumers to file Chapter 7 bankruptcy based on a financial means test and credit counseling requirements that may require a repayment of some of your debt.

Retainer Agreement at 23.

Mr. Clark also signed a Dedicated Account Agreement and Application with Global Client Solutions ("GCS") (Exhibit 2), establishing a dedicated account for Mr. Clark (the "GCS Account") and authorizing GCS to debit his checking account in the amount of $906.90 each month on the 15th of the month. The Dedicated Account Agreement provided GCS would assess a $10.75 monthly service charge to maintain the account and would charge other fees for other services, including for each disbursement, with the amount of the fee dependent on the type of disbursement.

Once Mr. Clark signed the Retainer Agreement and Dedicated Account Agreement, the notary changed the LeadTrac status to signed. The LeadTrac system notified Mr. Minton of the status change. The LeadTrac system also notified Kevin Wang he needed to review the file and initiate the Attorney-Client Consultation Call.

Mr. Wang testified that, in preparation for an Attorney-Client Consultation Call, he would review the client's file to see whether the client met the program criteria (by which he meant whether the client had unsecured, consumer debts) and whether the financial information in the client's file indicated the client could afford the program. The financial information in the client's file was limited to income and expenses; it did not include all the client's assets or all the client's liabilities. Mr. Wang further testified he usually asked if the client were aware bankruptcy filing was an option, but because Mr. Wang was not a bankruptcy attorney, he did not go into the details of bankruptcy.

LeadTrac data reflects Mr. Wang countersigned the Retainer Agreement on

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 22-01166 KHT

September 25, 2019, at 3:58 p.m. LeadTrac data further reflects on September 25, 2019, at 4:49 p.m. Mr. Wang called Mr. Clark, was unable to reach him, and left a voice mail message. Immediately thereafter, the LeadTrac system sent two emails to Mr. Clark: one stated an attorney with The Commonwealth Law Group has been trying to reach you, and one stated an attorney with Colonial Law Group has been trying to reach you.[2] The email listed Mr. Wang's business phone number and a phone number for the "legal support team," which was actually Commonwealth Servicing's customer service phone number.

LeadTrac reflects Mr. Wang called Mr. Clark again on September 26 at 6:11 p.m., and October 1 at 7:05 p.m., leaving messages each time. The LeadTrac system continued to generate reminder emails to Mr. Wang, notifying him of the need to review the file and speak with Mr. Clark. On October 2, Mr. Wang was finally able to reach Mr. Clark and offered him a video consultation, which Mr. Clark declined. Mr. Wang confirmed the withdrawal amount and program details and approved Mr. Clark for the program.

Mr. Clark testified he spoke briefly with Mr. Wang after receiving "some block copy/paste emails" from Mr. Wang and another lawyer. Mr. Clark stated no legal matters were discussed, and no advice was given on the call.

The next day, October 3, Sal Pena (username "csgspena"), a non-lawyer negotiator employed by Commonwealth Law, began to reach out to Mr. Clark's creditors.

Also, Alissa Laidlaw (username "csgalaidlaw"), a customer service representative employed by Commonwealth Servicing, placed an "intro call" to Mr. Clark. According to the LeadTrac notes made by Ms. Laidlaw, Mr. Clark understood GCS and creditor call procedures, understood fees, and would send her his credit card statements. On October 15, Ms. Laidlaw uploaded the statements into LeadTrac and verified the balance owed on each account. She also sent Mr. Clark an email stating: "Great, thank you! Now it's just a matter of letting funds accumulate and these creditors['] willingness to negotiate. I will give you a call with any updates."

On October 17, Mr. Clark's first $906.90 monthly payment to GCS cleared.

On October 23, Mr. Clark emailed Ms. Laidlaw, stating he had received four separate letters from Capital One that the power of attorney provided by Commonwealth Law had not been acted upon. Ms. Laidlaw responded right away, stating: "Sometimes it takes a few attempts of us sending over the Power of Attorney before they accept it."

On October 31, Mr. Clark emailed Ms. Laidlaw asking for an update regarding the status of his accounts. He further stated:

---

[2] Colonial Law Group was one of many law firms for which Mr. Wang worked, including Anchor, Colonial, Frontier, Phoenix, Pioneer, Canyon, Summit, Golden, Whitestone, Option One, Hartland, Slate, Strong, Spring, and Glacier Bay. Each firm did the same or similar work as Commonwealth Law, using the same LeadTrac system. Mr. Rogus hired Mr. Wang for each. Mr. Wang testified the whole time he worked for those firms, he was also employed on a full-time basis with Cool Springs Financial Group.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 22-01166 KHT

I am getting bombarded with calls and emails from them as my balances with them just keep increasing because of missed payments and fees, as well as seeing my credit score taking a hit everyday. I know this is standard, however, I need proof that you guys are communicating with them. At this point I have no idea if anyone is communicating with them or not, as I am not and they seem to send correspondences suggesting that no one is in contact with them. Please help ease my mind here!

That same day, Ms. Laidlaw responded:

We have let them know you are in the program, however that does not stop their collection efforts to you. They are trying to get you to make a payment, that's how they get paid. When we spoke on the 11th I mentioned trying to change your contact information with the creditors to the phone number provided in the packet. If you haven't tried to change the number, I suggest doing so. It will help limit the number of calls you're receiving. The number is (978) 338-2313. The balances will go up, they will continue to send late payment notices. These can be disregarded. If ever they send you anything saying that an account has gone to a collection agency please send that our way so we know to reach out to the new agency rather than the original creditor.

The next day, Mr. Clark replied:

Ok thanks, Alissa-I have updated all of the info (as possible, per each website) on all the accounts with the provided address and phone number, however, they still seem to call / email me. What I was looking to hear back from you is if they have also been contacting you (or the number that you gave me to give to them) because it seems like they are calling me still and not you (which is what I thought would happen after I changed all of the contact info. I did this update right after our last phone call, so it would've been on the 11th or 12th. I have not once answered a call or responded to an email, nor logged onto my accounts since we last spoke, just FYI. I was just worried because if you guys ever screwed me and bolted on me, then I would be liable for way more $$ than I do know, since they raise the amounts monthly and I am not paying on them. I am not saying that you would do that, merely where I would stand if that did, indeed, happen at some point. So, we are good- I just needed to hear form someone that you were, in fact, operating on my behalf (since I got letters stating that they won't allow you to have power of atty for my accounts).

It does not appear Ms. Laidlaw responded to that message.

On December 4, Ms. Laidlaw uploaded to LeadTrac an initial demand letter sent by Vinci Law Office on behalf of American Express. The demand letter was assigned to Anthony Parisi (username "csgaparisi"), a non-lawyer negotiator employed by Commonwealth Law. Mr. Parisi had a telephone conversation with Mr. Clark, in which

11

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 22-01166 KHT

Mr. Clark told Mr. Parisi about his financial situation and hardships. Mr. Parisi then contacted Vinci Law Office in an attempt to settle the matter. He was not successful at that time.

Meanwhile, Mr. Clark continued to make his monthly $906.90 payments to GCS, with the third payment clearing December 18. On December 20, the LeadTrac system prompted Mark Scheer to perform a quarterly review.[3] LeadTrac records reflect Mr. Scheer reviewed the file on January 1, 2020, at 10:03 a.m., noting no lawsuits or other requests had been assigned to him, and the client should continue to add funds to his account so the negotiators would be able to settle his debts. Mr. Scheer did not note the demand letter sent by Vinci Law Office. Mr. Scheer did not reach out to Mr. Clark as part of the quarterly review.[4]

On January 10, Mr. Clark emailed Ms. Laidlaw with a letter stating one of his creditors, Synchrony Bank/Gap, would send his account to collections if he did not respond. Mr. Clark asked: "Thoughts? How is everything else going with my account? I haven't heard any updates from you recently. Please keep me informed." Ms. Laidlaw responded:

> If it does go to collections, please just let me know. We will then contact the collection agency rather than Synchrony directly. As far as an update, we may have one later on today or early next week. Anthony has a follow up with the law office today in regards to the American Express account. If we get any information regarding this we will let you know!

On approximately February 4, Mr. Clark was served with a Summons and Complaint Vinci Law Office had filed on behalf of American Express (Exhibit 5). On February 4, Mr. Clark emailed Ms. Laidlaw, stating: "I just got served papers from Amex (suing me?) with a court date of 3/17/2020. I've attached a photo of the first page (there are prob 30 pages or so in all). What should I do?!!" Ms. Laidlaw responded, asking Mr. Clark to scan and email or fax the documents to her, so she could send them to Mr. Parisi, who would contact the law office about a settlement. Mr. Clark responded: "Ok-Can I bring to the local lawyer? I can scan, but it will take some time. Otherwise, I can drop off at the lawyer office tonight or tmrw." Ms. Laidlaw replied: "Our internal litigation department will make an attempt to settle this account before the attorney is involved. If you could scan and email to me that would be great." Mr. Clark was unable to scan the large document but made a copy and sent it by FedEx to Commonwealth Servicing's Massachusetts address, to Ms. Laidlaw's attention. Ms. Laidlaw received the documents and uploaded them to the LeadTrac system.

---

[3] It is unclear why that task was not assigned to Mr. Wang, who had conducted the initial interview with Mr. Clark. The two attorneys worked independently of each other. Each had access to notes made in Mr. Clark's file, but neither made detailed notes for each other's use or for the use of Commonwealth employees.

[4] It would have been unlikely Mr. Clark would have been able to reach out to Mr. Scheer. Mr. Scheer testified he did not give clients his phone number, only Commonwealth's toll-free number and email address.

12

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 22-01166 KHT

Meanwhile, Mr. Clark continued to make his $906.90 monthly payments to GCS. His fifth payment cleared February 21. On February 26, Mr. Clark emailed Ms. Laidlaw, stating:

> Couple things to discuss: 1) my family has been getting calls from a law office saying that they need to reach me (guessing this is re Amex). 2) where do we stand on the Amex situation? I know the letter said that I would have to be in court on March 13 and I don't want to do that! Can you help me understand what is going on so that I'm not super anxious? Thanks!

Ms. Laidlaw emailed Mr. Parisi, who emailed Mr. Clark:

> Hello Jason, I apologize for the lack of communication on my part. I have been trying to get a settlement but, I've been getting the run around. I did submit an offer today and will hopefully get the response later today. They shouldn't be calling you or your family anymore. As soon as I have the numbers, I'll contact you to go over them.

A little more than two hours later, Mr. Parisi emailed Mr. Clark again:

> Hi Jason, Great news! I got the account settled. The balance is $16,528.16 and I was able to work out a settlement for $9,800.00 which is 60%. Typically when American Express goes to a law office they only go down to 75% at the best of times. I was even able to work it out so that we can make payments over 24 months so that all your funds won't be tied up for the next year and we can have funds available for another settlement while this settlement is going on. Vinci Law is going to mail you a stipulation agreement. It's very important that you sign it and mail it back to them as soon as possible. If they don't receive it within 5 days of your receiving the agreement, they will void the settlement and may pursue a wage garnishment. If you have any questions, please don't hesitate to contact me.

Mr. Parisi updated the debt status to reflect "Settlement 60%+ (Aggressive Litigation)" and created a Debt Settlement Plan providing for payment of $9,800 over 25 payments. Ms. Laidlaw called Mr. Clark and obtained his verbal authorization to approve the settlement. A little over 15 minutes after Ms. Laidlaw's call to Mr. Clark, Mr. Scheer approved the settlement through LeadTrac. Mr. Scheer testified he never contacted clients when considering whether to approve a settlement. The LeadTrac system sent Mr. Minton an email confirming the settlement approval.[5]

On February 28, acting on the direction of Commonwealth employees, GCS sent

---

[5] It is possible Mr. Minton was notified of each settlement because he or his company, Lendah, became entitled to compensation when settlements were reached. But, the Court does not have before it any evidence of compensation paid to Mr. Minton or Lendah. No funds withdrawn from Mr. Clark's GCS Account were paid directly to Mr. Minton or Lendah.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 22-01166 KHT

a $408.33 payment to Vinci Law Office from Mr. Clark's GCS Account.[6] On that same date, GCS also withdrew Commonwealth Law's settlement fee/service cost of $3,927.00, representing 25% of the $15,708.00 American Express debt. The balance of Mr. Clark's GCS Account went from $4,480.75 before those two transactions to $140.42 after.

Six days later, March 3, Mr. Clark had not received the stipulation from Vinci Law Office, so he reached out by phone. Alex Shea (username "csgashea"), the Commonwealth Servicing customer service representative who spoke with Mr. Clark, sent an email to Mr. Parisi, who responded (through Alex Shea) that Vinci Law Office needed time to draft the stipulation. Mr. Parisi later (March 5) left Mr. Clark a voice mail stating the stipulation was being emailed to Mr. Clark. LeadTrac does not reflect Commonwealth's receipt of the stipulation (before or after it was executed).

On March 18, Mr. Clark's sixth $906.90 monthly payment to GCS cleared. On March 19, GCS began withdrawing Commonwealth Law's retainer fee in monthly installments of $165. On March 27, GCS paid another $408.33 to Vinci Law Office. The balance of Mr. Clark's GCS Account at the end of March 27 was $458.24.

On March 31 at 3:00 a.m., the LeadTrac system prompted Mark Scheer to perform a quarterly review. LeadTrac records reflect Mr. Scheer reviewed the file on March 31 at 8:16 a.m., noting no lawsuits or other requests had been assigned to him, any litigation had been assigned to another attorney, and the client should continue to add funds to his account so the negotiators would be able to settle his debts. Mr. Scheer's notes did not mention the American Express lawsuit, which did not appear to have been assigned to any Commonwealth attorney. Mr. Scheer did not reach out to Mr. Clark as part of the quarterly review.

In April, Mr. Pena worked on a settlement with Capital One. According to the LeadTrac notes, Mr. Pena offered $4,000 over 24 payments, and the representative countered with $6,466.05. On April 23, Mr. Pena created a Debt Settlement Plan providing for payment of $6,466.05 over 56 payments and updated the debt status to "Settlement 1-40%." The LeadTrac system alerted Mr. Scheer to the settlement at 11:59 a.m., and two minutes later, at 12:01 p.m., Mr. Scheer approved it. Ms. Laidlaw called Mr. Clark and obtained his verbal authorization to approve the settlement. A confirmation email was sent to Mr. Minton.

On April 24, GCS sent a $61.05 payment to Capital One. On that same date, GCS also withdrew a portion of Commonwealth Law's settlement fee/service cost of $710.00 (the full fee would have been $4,985.50, representing 25% of the $19,942.00 Capital One debt). The balance of Mr. Clark's GCS Account had been $1,354.39 after his seventh monthly payment cleared on April 17. After a $165.00 withdrawal for Commonwealth Law's retainer fee, a $61.05 payment to Capital One, a $408.33 payment to Vinci Law Office, and two GCS phone pay charges of $5.00 each, Mr. Clark's GCS Account balance was $0.01.

---

[6] Commonwealth employees directed each deposit and withdrawal made to or from the GCS Account.

14

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 22-01166 KHT

In early May, Mr. Clark emailed Ms. Laidlaw, stating:

Hope you're hanging in there during these crazy times! Attached is a photo of a new noticed I received from PayPal. I also wanted to inquire as to how the progress of renegotiating my other accounts are going? I would assume that the cc companies are willing to renegotiate immediately with anyone that is currently willing to pay anything, right?! Please let me know.

Ms. Laidlaw responded:

Thank you, I hope you are doing well! Unfortunately, the credit cards are negotiating settlements mostly the same as they were before the pandemic. Your two current settlements, Capital One and American Express are using up most funds so there are not funds available for another settlement right now. Due to these two settlements using up most funds, the next settlement is projected to be around December of 2021. You do have the option of adding in funds, or raising your draft to speed the program along and move the timeline up for another settlement. Otherwise, we will continue using your funds for these two settlements and will settle another account when funds are available.

Mr. Clark replied: "Thanks for the update. Unfortunately, I'm unemployed now like so many millions of others and do not have extra funds to add to the kitty. Hoping it's not like this for too long or we are all screwed. Thanks for the update and be well." Ms. Laidlaw replied with similar sentiments and well wishes.

Mr. Clark's eighth $906.90 monthly payment to GCS cleared May 19, bringing his balance to $906.91. After a $165.00 withdrawal for Commonwealth Law's retainer fee, a $183.00 payment to Capital One, a $129.00 withdrawal for Commonwealth Law's settlement fee/service cost for the Capital One settlement, a $408.33 payment to Vinci Law Office, and GCS service charges, Mr. Clark's GCS Account balance was $0.83.

Mr. Clark's ninth $906.90 monthly payment to GCS cleared June 17, bringing his balance to $907.73. After a $165.00 withdrawal for Commonwealth Law's retainer fee, a $183.00 payment to Capital One, a $129.00 withdrawal for Commonwealth Law's settlement fee/service cost for the Capital One settlement, a $408.33 payment to Vinci Law Office, and GCS service charges, Mr. Clark's GCS Account balance was $1.65.

On June 30, the LeadTrac system notified Mr. Scheer of the need to conduct a quarterly review, and he completed the review that same day. His notes are the same as those for the prior quarters. He did not mention the inability to accomplish additional settlements without the deposit of additional funds, nor did he mention Mr. Clark's unemployment. He did not reach out to Mr. Clark as part of his quarterly review.

Mr. Clark's tenth $906.90 monthly payment to GCS cleared July 17, bringing his balance to $908.55. After a $165.00 withdrawal for Commonwealth Law's retainer fee, a $183.00 payment to Capital One, a $129.00 withdrawal for Commonwealth Law's

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 22-01166 KHT

settlement fee/service cost for the Capital One settlement, a $408.33 payment to Vinci Law Office, and GCS service charges, Mr. Clark's GCS Account balance was $2.47.

In early August, Denison Lugo (username "csgdelugo"), an employee of Commonwealth Servicing, was assigned as Mr. Clark's customer representative.

Mr. Clark's eleventh $906.90 monthly payment to GCS cleared August 19, bringing his GCS Account balance to $909.37. After a $165.00 withdrawal for Commonwealth Law's retainer fee, a $183.00 payment to Capital One, a $129.00 withdrawal for Commonwealth Law's settlement fee/service cost for the Capital One settlement, a $408.33 payment to Vinci Law Office, and GCS service charges, Mr. Clark's GCS Account balance was $3.29.

Mr. Clark's twelfth $906.90 monthly payment to GCS cleared September 17, bringing his GCS Account balance to $910.19. After a $165.00 withdrawal for Commonwealth Law's retainer fee, a $183.00 payment to Capital One, a $129.00 withdrawal for Commonwealth Law's settlement fee/service cost for the Capital One settlement, a $408.33 payment to Vinci Law Office, and GCS service charges, Mr. Clark's GCS Account balance was $4.11.

On September 29, the LeadTrac system notified Mr. Scheer to conduct a yearly review. Mr. Scheer placed seven calls to Mr. Clark, leaving voice mail messages each time, but the calls were not returned. On October 2, Mr. Scheer completed the review without Mr. Clark, noting Mr. Clark had avoided his calls, but Mr. Scheer otherwise had no concerns about his file. Mr. Scheer noted Mr. Clark's GCS Account had a balance of $4 but did not make any notes as to Mr. Clark's unemployment or any concerns about his ability to make ongoing payments.

On October 7, Mr. Clark called Commonwealth, and Ted Percival (username "csgtpercival"), a customer service representative employed by Commonwealth Servicing, took the call. Mr. Percival made the following notes of the conversation:

> CCI, was asking what would happen if he can't make a payment, or if he needed to quit. We talked about clients terming and he knows the accounts will be lost. We spoke about BK, and how clients need to be approved, and probably pay back close to the full amount, not saving anything, but affordable payments. We spoke that we are last resort. I asked if client could make $670.00 payment to keep the two settlements going? He said no! He can't make a payment. I explained the accounts probably will be canceled, and went over the different scenarios when the accounts are cancelled. I sent him the Skip draft while in settlement form. Client will keep us updated, and I told him call us 4 Biz days prior to any draft change, because once its processing we can't stop. Change it!

By "clients need to be approved," Mr. Percival was referring to debtors' eligibility to proceed in bankruptcy under a particular chapter of the Bankruptcy Code (Chapter 7, which cases were usually completed quickly, or Chapter 13, which cases required

16

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 22-01166 KHT

payments over an extended period of time).[7] Mr. Percival's reference to "affordable payments" meant Chapter 13 plan payments, which would have been lower than the payments Mr. Clark was then making to Commonwealth Law but, over time, would add up, the effect of which could be to "pay back close to the full amount [of the credit card debts], not saving anything."

Mr. Clark signed the Skip Draft form, and the thirteenth payment, due October 15 was skipped and moved to the end of the plan term. Mr. Clark's next payment was due November 15, and LeadTrac records reflect it failed for insufficient funds. The LeadTrac system sent an email to Mr. Clark with the subject "Issue with Your Payment." On November 19, Mr. Clark sent an email stating as follows:

> Hi-Unfortunately I still haven't been hired as of yet (had an interview on Monday that I'm still waiting to hear back on- it went great so hoping I hear back ASAP). When we spoke about this last month, you mentioned that I should have about 3-4 mths of deferred payments to help me get through this and so that's what I've been going by. I had no idea you would try to process payment again in Nov. Since that's happened and been returned for lack of available funds, I have been charged $35 by my bank. So now I'm even further behind...Can we still defer payments to the back end of my agreement until I get hired full time again?

Mr. Lugo responded by email as follows:

> I apologize for the miscommunication the last representative you spoke with was Teddy Percival. At this time two of your accounts have been cancelled and one of them being in a law office. Due to these back-to-back missed payments, I must warn you, you do run the risk of litigation with your American Express account given the cancelation of the settlement. These two renegotiations can impact your program moving forward. Please at your earliest convenience contact us as soon as possible so that we can best assist you.

Mr. Clark apparently called and spoke with Mr. Lugo. Mr. Lugo's notes provide as follows:

> CC regarding NSF. The client was under the impression that his future payment were [deferred] due to his financial situation. I explained to the

---

[7] As referenced in the Retainer Agreement at p. 23, the 2005 Bankruptcy Abuse Prevention and Consumer Protection Act (BAPCPA) significantly steered debtors from Chapter 7 to Chapter 13 by introducing a "means test." Debtors with sufficient "means" (disposable income) to pay their creditors are ineligible to proceed in Chapter 7 and must proceed in Chapter 13, which requires a 3- or 5-year commitment, depending on the debtor's income. Debtors whose disposable income exceeds means test amounts are not "approved" to be Chapter 7 debtors and must proceed in Chapter 13. The Court finds this to be the most reasonable interpretation of Mr. Percival's use of "approved," as there is otherwise no approval process required for an individual debtor to file a bankruptcy case, regardless of chapter. By providing this context for interpreting Mr. Percival's call notes, the Court does not find Mr. Percival specifically referenced BAPCPA, the means test, or any particular chapter or section of the Bankruptcy Code during his conversation with Mr. Clark. The Court has no such evidence before it.

client that his payments could not have been [deferred] because his account is negative and has lost 2 active SIF [settlements in full] one of them being in a law office. Client insist that in his last conversation wit a CSR they let him know that he would have enough in his account to resolve accounts for the time being. I explain to him the urgency on getting back on track with the monthly payment and authorized a make up payment on 11/27/2020. He stated he will call us to let us know if anything changes.

Mr. Clark's next $906.90 monthly payment to GCS (the make-up payment set for November 27) cleared December 2, bringing his GCS Account balance to $911.01. After a $165.00 withdrawal for Commonwealth Law's retainer fee, and GCS service charges, Mr. Clark's GCS Account balance was $713.76.

Mr. Clark's next $906.90 monthly payment to GCS cleared December 17, bringing his GCS Account balance to $1,620.66. After a $165.00 withdrawal for Commonwealth Law's retainer fee,[8] and GCS service charges, Mr. Clark's GCS Account balance was $1,444.91. GCS did not send any payments to Capital One or Vinci Law Office in October, November, or December.

On December 29, the LeadTrac system notified Mr. Scheer to conduct a quarterly review, which he performed that day. His notes are the same as those for the prior quarters. He did not mention Mr. Clark's unemployment or missed payments, nor did he note the failure of the settlements with Capital One or Vinci Law Office or the likelihood that Vinci Law Office would proceed with litigation. He did not make any note regarding the bankruptcy-related information Mr. Percival, a non-attorney employee of Commonwealth Servicing, had provided Mr. Clark over the phone. He did not reach out to Mr. Clark as part of his quarterly review.

On January 14, 2021, Mr. Clark e-mailed Mr. Parisi asking for a fully-executed copy of his Retainer Agreement. Mr. Parisi responded and also notified Mr. Clark that Mr. Lugo was his client services representative.

On January 19, a negotiator with the LeadTrac username "csgcnazer" made the following notes (in separate entries):

Spoke to law firm. Client called and spoke to law firm directly. He got a 3 month deferment on this settlement. The next payment is due 1/28/21. He set up payments through his personal account. We have already collected all of our fee. [Creditor: Vinci Law Office, LLC,]

Called Capital One. Client had called Capitol One and set up payments for January forward. I set up the the missed payments for the settlement--- Oct/Nov/Dec/Jan payments will be taken on Jan 23rd. $732.00. Settlement

---

[8] This appears to be the last withdrawal made for the retainer fee. In total, $1,485.00 of the $1,650 retainer fee was withdrawn from Mr. Clark's GCS Account. It is likely the remaining $165 was intended to be withdrawn in connection with Mr. Clark's thirteenth monthly payment (due October 15), which was skipped and moved to the end of the plan.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 22-01166 KHT

is back in place. [Creditor: CAPITAL ONE, Acct#: 2914]

Mr. Lugo left a voice mail message for Mr. Clark, who called back. Mr. Lugo's notes reflect the following:

> CCI regarding VM. I let him know that our negotiator attempted to reach out to his creditors and was informed by them, that they have been speaking with the client directly. I as I was explaining the importance of allowing all the communication to be done by us for the negotiations, the client interrupted and said "Let me stop you right there. I have not spoken to them and what you are saying is quite alarming. Is some one calling and impersonating me? I have not called them.'" I then told client that this could be away of the creditor to deter the negotiations and, to keep in mind if they call him to allow us to do the communicating.

Mr. Clark's next monthly payment to GCS cleared January 20, bringing his GCS Account balance to $2,351.81. After a $732.00 payment to Capital One, a $1,200 withdrawal for Commonwealth Law's settlement fee/service cost for the Capital One settlement, and GCS service charges, Mr. Clark's GCS Account balance was $404.86.

Mr. Clark's next monthly payment to GCS cleared February 18, bringing his GCS Account balance to $1,310.96. After a $183.00 payment to Capital One, a $295.00 withdrawal for Commonwealth Law's settlement fee/service cost for the Capital One settlement, and GCS service charges, Mr. Clark's GCS Account balance was $817.21.

Mr. Clark's next monthly payment to GCS cleared March 17, bringing his GCS Account balance to $1,724.11. After a $183.00 payment to Capital One, a $295.00 withdrawal for Commonwealth Law's settlement fee/service cost for the Capital One settlement, and GCS service charges, Mr. Clark's GCS Account balance was $1,230.36.

On March 29, the LeadTrac system notified Mr. Scheer to conduct a quarterly review, which he performed that day. His notes are the same as those for the prior quarters. He did not mention the inconsistent statements regarding Mr. Clark's direct contact with Vinci Law Office and Capital One, nor did he note the status of either of those settlements. He did not reach out to Mr. Clark as part of his quarterly review.

On April 28, Mark Frampton (username "csgmframpton"), a non-lawyer negotiator employed by Commonwealth Law, achieved a settlement with creditor Second Round, which had purchased Mr. Clark's debt to Synchrony Bank/Gap. Mr. Frampton created a Debt Settlement Plan providing for payment of $1,800.52 over 25 payments and updated the debt status to "Settlement 40-60%." Mr. Lugo sent an email to Mr. Clark stating: "We have obtained a settlement offer we need to speak with you about. Please call our office to discuss this offer. Also note that these offers are time sensitive, so we need to connect with you as soon as possible to take advantage of it." Kevin Wang reviewed the settlement on April 29 and approved it, noting "Settlement is within acceptable parameters. Settlement approved." A confirmation email was sent to Mr. Minton. Mr. Clark authorized the settlement, and payments to Second Round began.

Mr. Clark's April monthly payment to GCS cleared April 19, bringing his GCS Account balance to $2,137.26. After a $183.00 payment to Capital One, two $295.00 withdrawals ($590.00 total) for Commonwealth Law's settlement fee/service cost for the Capital One settlement, a $75.00 payment to Second Round, a $952.98 withdrawal for Commonwealth Law's settlement fee/service cost for the Synchrony Bank/Gap/Second Round settlement,[9] and GCS service charges, Mr. Clark's account balance was $654.68.

Mr. Clark's next monthly payment to GCS cleared May 20, bringing his GCS Account balance to $1,225.43. After a $75.00 payment to Second Round, a $183.00 payment to Capital One, a $295.00 withdrawal for Commonwealth Law's settlement fee/service cost for the Capital One settlement, and GCS service charges, Mr. Clark's GCS Account balance was $654.68.

On June 23, Andy Morceau (username "csgamorceau"), a non-lawyer negotiator employed by Commonwealth Law, obtained a settlement with Credit Corp. Solutions, which had acquired Mr. Clark's debt to PayPal. Mr. Morceau created a Debt Settlement Plan providing for payment of $3,225.44 over 32 payments and updated the debt status to "Settlement 40-60%." Mark Scheer approved the settlement. Mr. Lugo sent an email to Mr. Clark with the same message as previously sent April 28 regarding Second Round. Mr. Lugo also followed up by phone, and Mr. Clark authorized the settlement. Settlement payments began to be made to Credit Corp. Solutions.

Mr. Clark's June monthly payment to GCS cleared June 17, bringing his GCS Account balance to $1,561.58. After a $183.00 payment to Capital One, a $75.00 payment to Second Round, a $64.44 payment to Credit Corp. Solutions, a $295.00 withdrawal for Commonwealth Law's settlement fee/service cost for the Capital One settlement, an $820.00 withdrawal for Commonwealth Law's settlement fee/service cost for the PayPal/Credit Corp. Solutions settlement,[10] and GCS service charges, Mr. Clark's GCS Account balance was $101.39.

On June 27, the LeadTrac system notified Mr. Scheer to conduct a quarterly review, which he performed that day. His notes are the same as those for the prior quarters. He did not reach out to Mr. Clark as part of his quarterly review.

Mr. Clark's July monthly payment to GCS cleared July 19, bringing his GCS Account balance to $1,008.29. After a $125.76 withdrawal for Commonwealth Law's

---

[9] The original Synchrony Bank/Gap balance listed on the Retainer Agreement was $2,711.00. On October 15, 2019, when Ms. Laidlaw uploaded Mr. Clark's credit card statements and verified the balances due, she updated the initial balance to $3,811.89, 25% of which is $952.97. The Retainer Agreement allowed Commonwealth to verify and update initial debt balances.

[10] The original PayPal balance listed on the Retainer Agreement was $3,580.00. On October 15, 2019, when Ms. Laidlaw uploaded Mr. Clark's credit card statements and verified the balances due, she updated the initial balance to $3,783.01, 25% of which is $945.75. The Retainer Agreement allowed Commonwealth to verify and update initial debt balances.

settlement fee/service cost for the PayPal/Credit Corp. Solutions settlement,[11] a $183.00 payment to Capital One, a $109.00 payment to Credit Corp. Solutions, a $75.00 payment to Second Round, a $295.00 withdrawal for Commonwealth Law's settlement fee/service cost for the Capital One settlement, and GCS service charges, Mr. Clark's GCS Account balance was $197.78.

Mr. Clark's August monthly payment to GCS cleared August 18, bringing his GCS Account balance to $1,104.68. After a $183.00 payment to Capital One, a $75.00 payment to Second Round, a $109.00 payment to Credit Corp. Solutions, a $295.00 withdrawal for Commonwealth Law's settlement fee/service cost for the Capital One settlement, and GCS service charges, Mr. Clark's GCS Account balance was $419.93.

Mr. Clark's September monthly payment to GCS cleared September 17, bringing his GCS Account balance to $1,326.83. After a $183.00 payment to Capital One, a $75.00 payment to Second Round, a $109.00 payment to Credit Corp. Solutions, a $71.33 withdrawal for Commonwealth Law's settlement fee/service cost for the Capital One settlement,[12] and GCS service charges, Mr. Clark's GCS Account balance was $865.75.

On September 25, the LeadTrac system notified Mr. Scheer to conduct a yearly review. Mr. Scheer's notes indicate he completed a call to Mr. Clark. His notes are the same as those for the quarterly reviews. The notes do not include any reference to Mr. Clark's period of unemployment or inability to make payments.

Mr. Clark's October monthly payment to GCS cleared October 19, 2021, bringing his GCS Account balance to $1,772.65. During the month of October, payments were made to Second Round ($75.00), Capital One ($183.00), and Credit Corp. Solutions ($109.00). After those charges and GCS service charges, Mr. Clark's GCS Account balance was $1,382.90.

Meanwhile, Mike Gastonguay (username "csgmgastonguay"), an employee of Commonwealth Servicing, was assigned as Mr. Clark's Customer Service Representative. On November 9, Mr. Gastonguay received an email from Mr. Clark, who stated as follows:

> I am almost busted now unfortunately and am having to look at bankruptcy options if I can't figure out another way. I need to find out where I stand with things at Commonwealth at this moment asap please (who can I talk to / not talk to / how much left do I owe, etc.). I've tried to find out my account info with Global Holdings, but it doesn't show balances- just payments made. Need full detail sheet of what I've paid and what I have left to pay on our agreement please!!

---

[11] At this point, Commonwealth Law had received the full settlement fee/service cost for the PayPal/Credit Corp. Solutions settlement.

[12] At this point, Commonwealth Law had received the full settlement fee/service cost for the Capital One settlement.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 22-01166 KHT

Mr. Gastonguay replied as follows:

> I've listed the status of each account below per your request. Please let me know if you have any questions. Thanks! Citi 9173 - Pending negotiations last verified balance = $18,053.47 Capital One 2914 - Remaining balance on active settlement = approx. $3,111.00 Syncb/Gapdc 6009 - Remaining balance on active settlement = approx. $1,275.52 Paypal 6417 - Remaining balance on active settlement = approx. $2,725.00

Mr. Clark then asked Mr. Gastonguay: "If I do have to declare bankruptcy, what does that mean for our situation?" Mr. Gastonguay called Mr. Clark and left a detailed voice mail message. No Class B attorney was notified to contact Mr. Clark about his bankruptcy question.

Meanwhile, Commonwealth Law's negotiators continued to work on settlements of Mr. Clark's debts. On November 9, Mr. Morceau reached out to Phillips & Cohen Associates, which had previously held Mr. Clark's debt to Citi, and learned the debt had been acquired by Radius Global Solutions. Mr. Morceau achieved a settlement with Radius Global Solutions that same day.[13] He created a Debt Settlement Plan providing for payment of $4,513.37 over 28 payments and updated the debt status to "Settlement 1-40%." Mr. Gastonguay emailed Mr. Clark to obtain authorization for the settlement, and Sandy (username "csgspfeil"), presumably a Commonwealth Services employee, spoke to Mr. Clark on the phone, obtaining the authorization.

Mark Scheer approved the settlement. He did not make any mention of reviewing the file or noticing Mr. Clark's message stating his inability to continue making payments and raising questions regarding bankruptcy. Approval of the settlement caused Commonwealth Law (and, in turn, Commonwealth Servicing) to earn a fee.[14]

On November 12, Mr. Clark emailed Mr. Gastonguay, stating: "I am not going to be able to make the payment on Nov 15th, so what are my options in order to push this payment?" Mr. Gastonguay called Mr. Clark to discuss, leaving a voicemail advising Commonwealth needed at least four business days' notice to change a draft payment. But, after speaking with his supervisor, Brian Kwiatek (brother of Commonwealth Servicing owner Dan Kwiatek),[15] Mr. Gastonguay temporarily suspended the payment

---

[13] Radius Global Solutions sent a letter confirming the settlement terms, which letter was dated November 11 and addressed to Commonwealth Servicing Group. Not only does this letter show how interconnected Commonwealth Law and Commonwealth Servicing were, but also it shows the lack of involvement of a Colorado-licensed attorney in the settlement.

[14] This fee was earned but was not paid. A withdrawal of $236.00, representing a payment on Commonwealth Law's settlement fee/service cost for the Citi/Radius Global Solutions settlement, was made December 20, but the withdrawal was reversed because of Mr. Clark's bankruptcy filing.

[15] Brian Kwiatek supervised Commonwealth Servicing employees. Thomas Rogus, an owner of Commonwealth Law and the company's 30(b)(6) representative, testified Brian was a supervisor at Commonwealth Servicing (Thomas Rogus deposition, P. 23, lines 3-5). Brian Kwiatek also supervised Commonwealth Law negotiators. Commonwealth Law negotiator Sal Pena testified Brian Kwiatek was his supervisor. (Salvador Pena deposition, P.9, lines 8-10). Dan Kwiatek, an owner of Commonwealth

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 22-01166 KHT

schedule so GCS would not draft the November payment. Mr. Gastonguay noted: "Client is a bankruptcy risk per his prior e-mails." Mr. Gastonguay also sent an email stating:

> Hi all as a heads up Jason Clark #23857725 is unable to make a payment until 12/15 and will be making both his November and December deposits on that date. Client has funds in Global to cover for November but some fee will need to be moved. Thanks for your help!

During the month of November, payments were made to Capital One ($183.00), Second Round ($75.00), Credit Corp. Solutions ($109.00), and Radius Global Solutions ($50).[16] After those charges and GCS service charges, on December 7, 2021, Mr. Clark's GCS Account balance was $936.15.

On December 16, Mr. Clark filed his Chapter 7 bankruptcy petition. He did not notify Commonwealth Law or Commonwealth Servicing of his filing.

Mr. Clark did not make any further payments to GCS. Mr. Gastonguay attempted to reach Mr. Clark multiple times, sending emails and leaving voice mails, but Mr. Clark did not return the emails or calls. Creditor settlement payments and a payment on Commonwealth Law's settlement fee/service cost for the Citi/Radius Global Solutions settlement were made in December, but those payments were subsequently reversed.

On December 24, the LeadTrac system notified Mr. Scheer to conduct a quarterly review, which he performed that day. His notes are the same as those for the prior quarters. He did not mention Mr. Clark's emails regarding his inability to make the payments, his missed payments, his "bankruptcy risk" as noted by Mr. Gastonguay, or his non-response to Commonwealth Servicing representatives' efforts to reach him. He did not reach out to Mr. Clark.

Mr. Gastonguay continued his efforts to reach Mr. Clark, sending emails and making phone calls, leaving voice mails, multiple times per day, multiple days into the month of January 2022. No Commonwealth employee or representative checked with anyone other than Mr. Clark to find out whether Mr. Clark had filed a bankruptcy petition, either by calling this Court (the only bankruptcy district in Colorado) or by checking online information such as PACER (Public Access to Court Electronic Records), a system that provides 24/7 online access to federal bankruptcy case information and would have confirmed Mr. Clark's bankruptcy filing.

Around January 12, Mr. Morceau noticed some of the creditor settlement payments made in December had not cleared. When he contacted the creditors, he was informed

---

Servicing and the company's 30(b)(6) representative, testified Brian was not a Commonwealth Servicing employee (Dan Kwiatek deposition, p.8, line 13-16) but was an employee and head negotiator at Commonwealth Law. (*Id.* P. 52, lines 14-16).

[16] The November payment to Radius Global Solutions was initially made to Credit Control, LLC, but when the error was discovered, the charge was reversed. Radius received its November payment December 7, 2021.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 22-01166 KHT

the accounts had been pulled because Mr. Clark had filed a bankruptcy petition.

On January 21, Mr. Gastonguay sent a message to globalinfo@commonwealthservicing.com stating: "We were unable to save Jason Clark, Client ID 23857725. Please log into Global [GCS] and set up a withdrawal of the client's funds. Once that is complete we may place client into status Termination Request in the Accounting workflow to close out the clients account." Mr. Gastonguay also noted the file as follows "Please terminate client client has been unresponsive, has not made a payment since October, and is believed to have filed bankruptcy. Thanks!" The LeadTrac system was updated to clear attorney review notifications, and no more attorney reviews were conducted.

During the time Mr. Clark participated in Commonwealth's program, he deposited $21,765.60 into his GCS Account. Those funds were ultimately disbursed as follows: $12,297.07 paid to Commonwealth Law[17] (which in turn paid $10,683.07 of those funds to Commonwealth Servicing);[18] $8,064.13 paid to the holders of the five enrolled debts ($3,266.64 to American Express/Vinci Law Office, $3,538.05 to Capital One, $600.00 to Synchrony Bank/Gap/Second Round, $609.44 to PayPal/Credit Corp. Solutions, $50.00 to Citi/Radius Global Solutions); $491.75 in fees paid to GCS; and $912.65 refunded to Mr. Clark. For work on Mr. Clark's case, Mr. Wang was paid $75.00 ($65.00 for the initial client call and $10.00 for reviewing the Synchrony Bank/Gap/Second Round settlement), and Mr. Scheer was paid $190.00 ($10.00 per quarterly review, of which he conducted 7; $40.00 per annual review, of which he conducted 2; and $10.00 per settlement review, of which he conducted 4).[19]

None of the settlements negotiated for the five enrolled debts was fully paid when Mr. Clark filed his bankruptcy petition. Each of the five enrolled debts was listed on Mr. Clark's Schedule E/F.

## III.    APPLICABLE LAW

The Colorado Uniform Debt Management Services Act, Colo. Rev. Stat. § 5-19-201, *et seq.* ("CUDMSA"), regulates providers of debt-management services and prohibits them from providing services to Colorado residents unless the providers are registered with the state. CUDMSA also regulates the language of agreements between providers

---

[17] By the Court's calculations, this included $1,485.00 for the retainer fee and $10,812.07 in settlement fees/service costs ($3,927.00 for the American Express settlement, $4,986.33 for the Capital One settlement, $952.98 for the Synchrony Bank/Gap settlement, and $945.76 for the PayPal/Credit Corp. Solutions settlement). Commonwealth Law earned a settlement fee/service cost for the Citi settlement, but none of that was paid prior to Mr. Clark's bankruptcy filing.

[18] This amount represents approximately 99% of the $10,812.07 in settlement fees/service costs paid to Commonwealth Law.

[19] Mr. Rogus testified Mr. Scheer was paid $490, but the numbers do not support that amount. The Court assumes Mr. Rogus meant to say 190, which is the sum of 70, 80, and 40 (or, the court reporter may have made a typographical error).

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 22-01166 KHT

and their clients and regulates the fees charged. CUDMSA provides a private right of action against those who violate its terms, allowing individuals to recover compensatory damages, trebled or punitive damages, and reasonable attorney fees and costs.

Here, neither Commonwealth Law nor Commonwealth Servicing was registered as a debt-management provider in Colorado. Each entity argues CUDMSA does not apply to it, for different reasons. Commonwealth Servicing asserts it did not provide "debt-management services" to Mr. Clark. Commonwealth Law asserts its services are excluded from the definition of "debt-management services."

The Court first turns to the statutory language. CUDMSA provides, in relevant part, as follows:

> (8)(A) "Debt-management services" means services as an intermediary between an individual and one or more creditors of the individual for the purpose of obtaining concessions, but does not include:
>
> (i)  Legal services provided in an attorney-client relationship by an attorney licensed to practice law in this state;
>
> . . . .
>
> (B)  The exemptions in subsection (8)(A) of this section do not apply to any person who directly or indirectly provides any debt management services on behalf of a licensed attorney . . . if that person is not an employee of the licensed attorney . . . .

Colo. Rev. Stat. § 5-19-202(8).

The Colorado Supreme Court has held the legal services exclusion is not limited to attorneys; the exclusion can be applied to those who work for attorneys, such as paralegals. But, "[a]t a minimum, the person seeking an exemption must work for the attorney – in substance, not just in name – and under the attorney's supervision." *Coffman v. Williamson*, 348 P.3d 929, 938 (Colo. 2015).

Finally, the Colorado Supreme Court has held the legal services exclusion must be narrowly construed:

> [CUDMSA] is a remedial statute enacted to protect consumers, and we must construe it liberally to effectuate that purpose. Likewise, we must apply its exemptions narrowly so as not to frustrate [CUDMSA's] remedial purposes. *See Showpiece Homes Corp. v. Assurance Co. of Am.*, 38 P.3d 47, 53 (Colo. 2001) (explaining that "in determining whether conduct falls within the purview of the CCPA, it should ordinarily be assumed that the CCPA applies to the conduct" so as not to frustrate the CCPA's "strong and sweeping remedial purposes"); *see also In re Gentry*, 463 B.R. 526, 531

(Bankr. D. Colo. 2011) ("[E]xceptions to remedial legislation should be construed narrowly.").

*Id.* (some citations omitted).

Whether Commonwealth Servicing provided debt-management services to Mr. Clark is an element of Trustee's claim as to which Trustee bears the burden of proof. Whether Commonwealth Law falls within the legal services exclusion is an affirmative defense as to which Commonwealth Law bears the burden of proof. *State ex rel. Suthers v. Johnson L. Grp., PLLC*, 350 P.3d 961, 966 (Colo. Ct. App. 2014).

## IV.    DISCUSSION

### A.    Debt-Management Services.

CUDMSA defines debt-management services as "services as an intermediary between an individual and one or more creditors of the individual for the purpose of obtaining concessions." Colo. Rev. Stat. § 5-19-202(8). Here, Commonwealth Servicing asserts it did not provide debt-management services to Mr. Clark. The Court disagrees.

Although the negotiators worked only for Commonwealth Law, and the customer servicing representatives worked only for Commonwealth Servicing, they worked in the same office space, and one person supervised and directed both sets of employees: Brian Kwiatek, brother of Commonwealth Servicing owner Dan Kwiatek. Dan Kwiatek testified Brian Kwiatek was a Commonwealth Law employee, and Sal Pena, a Commonwealth Law negotiator, testified Brian Kwiatek was his supervisor. Thomas Rogus, an owner of Commonwealth Law, testified Brian Kwiatek was a Commonwealth Servicing employee, and the evidence before the Court shows he supervised Commonwealth Servicing employees. The undefined, overlapping nature of management supports a conclusion employees of both companies worked jointly in the provision of debt-management services.

The Defendants argue Commonwealth Servicing employees performed administrative support tasks for Commonwealth Law. The facts of the case do not support that conclusion. Commonwealth Servicing's customer service representatives engaged in substantive direct contact with clients such as Mr. Clark, obtaining approval of settlements and authorization of payments. Their work was not supervised or directed by the negotiators. Each set of employees (the negotiators and the customer service representatives) had its own, separate tasks. The two employee sets operated independently but interdependently as two links in a chain connecting creditors to clients. Each link of the chain was necessary to accomplish consummated settlements. In obtaining client approval of settlements and authorization of payments, Commonwealth Servicing's customer service representatives acted as intermediaries between clients and creditors.

Commonwealth Servicing points out it was not paid directly by Mr. Clark, and no money went directly from Mr. Clark's GCS Account to Commonwealth Servicing. But,

26

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 22-01166 KHT

CUDMSA applies to those who do not receive funds directly from a client. As the Official Comments to the Uniform Debt-Management Services Act ("UDMSA"), on which CUDMSA was based, provide:

> The definition [of debt-management services] encompasses the activity of entities that act as an intermediary between an individual and the individual's creditors, for the purpose of changing the terms of the original contract between the individual and those creditors. There is no requirement that the individual's money flow through the provider. Hence, the definition includes the services of credit-counseling agencies and debt-settlement companies even if they do not have control over the individual's money, as when it is in an account managed by the individual or a third party.

UDMSA, § 2 cmt. 8 (2005).[20]

Finally, CUDMSA is "a remedial statute enacted to protect consumers, and we must construe it liberally to effectuate that purpose." *Coffman v. Williamson*, 348 P.3d at 938. A liberal construction requires the Court to find both sets of employees, who worked in concert in the provision of services to the client, provided debt-management services within the scope of CUDMSA.

The Court finds Trustee has met his burden of proving Commonwealth Law and Commonwealth Servicing provided debt-management services to Mr. Clark, and both are subject to CUDMSA.

### B.  Legal Services Exclusion.

As the Colorado Supreme Court held, the legal services exclusion contains three, separate components: (1) the provider must be an attorney licensed to practice in this state or must be employed by such an attorney and work for that attorney "in substance, not just in name – and under the attorney's supervision"; (2) the attorney or person working for the attorney must provide "legal services"; and (3) the attorney or person working for the attorney must provide those services "in an attorney-client relationship." *Coffman v Williamson*, 348 P.3d at 936 (setting forth requirements for attorneys); *id.* at 938 (applying requirements to those working for attorneys). The Court will discuss each in turn.

### 1.  Was the provider a Colorado-licensed attorney?

Messrs. Scheer and Wang were Colorado-licensed attorneys, but they were not the ones providing the debt-management services; instead, the Commonwealth Law negotiators and Commonwealth Servicing customer service representatives provided the debt-management services. Because Messrs. Scheer and Wang were owners of Class B

---

[20] CUDMSA requires a court to consider the need to promote uniformity of the law among states that enact it. Colo. Rev. Stat. § 5-19-238. Accordingly, the comments to the UDMSA are relevant to the interpretation of CUDMSA, especially the comments existing at the time Colorado adopted CUDMSA.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 22-01166 KHT

shares of Commonwealth Law, they may be considered owners of Commonwealth Law, and it may be possible to find they "employed" Commonwealth Law employees.[21] But, even if that were the case, Colorado law requires the Court to look beyond mere employment status. The non-attorney must work for the attorney "in substance, not just in name – and under the attorney's supervision." *Coffman v. Williamson*, 348 P.3d 929, 938 (Colo. 2015). As the Colorado Supreme Court held:

> the Rule [setting forth attorneys' professional responsibilities toward non-attorney employees] clearly contemplates meaningful instruction and supervision. Here, such instruction and supervision is conspicuously absent. [The firm] requires its engagement counsel to execute carefully crafted contracts, which portray [the firm] as subordinate to the law firms and acting under an attorney's supervision when it comes to legal matters. But the substance of their relationship reveals that "the tail wags the dog." Even the limited record before us now demonstrates that [the firm] is not acting for the lawyer in rendition of the lawyer's professional services; rather, the lawyer is acting for [the firm].

*Id.* at 938-39. Here, too, the substance of the relationship between Messrs. Scheer and Wang and Commonwealth Law reveals the "tail wags the dog."

Commonwealth Law's negotiators were the ones who procured the settlements between Mr. Clark and his creditors.[22] The negotiators did not speak to the Class B attorneys before or after a settlement was reached. Class B attorneys were not involved until after terms were fully negotiated with the creditors. When reviewing settlements, Class B attorneys did not reach out to creditors or clients.

Commonwealth's representatives testified settlements were not final until approved by a Class B attorney, but the facts in this case do not support that conclusion. For example, when presenting the American Express/Vinci Law Office settlement to Mr. Clark, Mr. Parisi used the statements: "I got the account settled," "I was able to work out a settlement for $9,800.00," "I was even able to work it out so that we can make payments over 24 months," and "If you have any questions, please don't hesitate to contact me." Just as there is no "I" in "team," there is no Class-B-attorney-supervised "team" in "I." Mr. Parisi was not exaggerating or otherwise mischaracterizing his role in obtaining the settlement. He was, in fact, the one who did the work to obtain the settlement, without any involvement of a Class B attorney. The settlement was presented to Mr. Clark as a fait accompli, and Mr. Clark authorized payment on it fifteen minutes before Mr. Scheer clicked the button to approve it.

---

[21] The Court so assumes for purposes of these findings of fact and conclusions of law, although the Court questions whether nominal stock ownership qualifies a person as an employer of that company's employees. Someone who owns one share of IBM stock would not be considered an employer of IBM's employees.

[22] The negotiators usually procured settlements within a day of being assigned to the case. Negotiator assignments were made by Brian Kwiatek, apparently upon being alerted to the presence of a certain balance available in the client's GCS account.

Even if Mr. Scheer or Mr. Wang had approved each settlement before it was considered final or presented to a client, the Court cannot find their approval process provided "meaningful instruction and supervision." Clicking an "approved" button (or, hypothetically, a "not-approved" button, although that was not done in this case and may not have been done in any case), within as little as two minutes after receiving the system prompt, does not constitute meaningful instruction or supervision.

Neither Mr. Scheer nor Mr. Wang provided meaningful instruction and supervision to Commonwealth Law employees. A fortiori, neither provided meaningful instruction and supervision to Commonwealth Servicing employees, who were the ones who discussed the settlements with the clients and obtained the clients' authorization to deduct funds from the account.

The Court cannot find Commonwealth Law or Commonwealth Servicing met its burden of establishing the providers of debt-management services were Colorado-licensed attorneys or were instructed or supervised by Colorado-licensed attorneys. The first element of the legal services exclusion is not satisfied.

## 2. Were legal services provided?

The term "legal services" defies simple definition. *See, e.g., Denver Bar Ass'n v. Pub. Utilities Comm'n*, 391 P.2d 467, 471 (Colo. 1964) ("There is no wholly satisfactory definition as to what constitutes the practice of law; it is not easy to give an all-inclusive definition. We believe that generally one who acts in a representative capacity in protecting, enforcing, or defending the legal rights and duties of another and in counselling, advising and assisting him in connection with these rights and duties is engaged in the practice of law. Difficulty arises too in the application of the definition."). In the Court's view, the term "legal services" includes an attorney's exercise of professional judgment applied to work such as drafting documents, appearing in court, or providing recommendations to a client (legal advice). Here, no Class B attorney drafted any relevant documents.[23] Also here, no Class B attorney appeared in court on Mr. Clark's behalf. Neither Commonwealth Law nor Commonwealth Servicing presented any evidence of any legal services rendered by Class B attorneys, with the possible exception of legal advice. The Court therefore focuses on whether Mr. Wang and/or Mr. Scheer provided legal advice to Mr. Clark.

---

[23] Specifically, the Retainer Agreement (which included the debts to be settled and the monthly amount to be paid) was not drafted by a Class B attorney. It was already completed and signed by Mr. Clark when Mr. Wang was alerted to make the Attorney-Client Consultation Call, and Mr. Wang countersigned the agreement a week before he spoke with Mr. Clark. It appears Mr. Minton prepared the Retainer Agreement (presumably using standard Commonwealth forms) and uploaded that agreement, as well as all other documents Mr. Clark reviewed and signed when he first retained Commonwealth Law, for the notary to give to Mr. Clark. Additionally, Class B attorneys did not participate in drafting or documenting any settlement between Mr. Clark and his creditors. To the extent settlements were documented, that documentation was between the creditors and Commonwealth Law (or Commonwealth Servicing, at least in the case of the Radius Global Solutions settlement).

29

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 22-01166 KHT

Mr. Wang's services to Mr. Clark consisted of one introductory phone call, during which Mr. Wang confirmed the withdrawal amount and program details and for which Mr. Wang was paid $65.00, and one settlement review, for which Mr. Wang was paid $10.00. Mr. Wang was unable to testify as to any specific legal matter discussed or advice given on the introductory phone call. He had no recollection of the call, and his notes did not reflect any legal matters discussed. At the time of the introductory phone call, Mr. Wang had already countersigned the Retainer Agreement, rendering that contract final. Mr. Clark testified he spoke briefly with Mr. Wang after receiving "some block copy/paste emails" from Mr. Wang and another lawyer (which was also Mr. Wang but identified with a different firm). Mr. Clark testified credibly that no legal matters were discussed, and no advice was given on the call.

Mr. Wang testified his usual practice for introductory phone calls was to ask whether the client understood the amounts being withdrawn and the way the program worked. Mr. Wang testified he usually asked if the client were aware bankruptcy filing was an option, but because Mr. Wang was not a bankruptcy attorney, he did not go into the details of bankruptcy. Asking someone if he understands the amounts being withdrawn and the way the program works is not providing legal advice. Mr. Clark's first customer service representative, Ms. Laidlaw, gave the same information when she made her intro call to Mr. Clark, as reflected in her notes. And, asking someone if he is aware bankruptcy filing is an option, without giving more information, is not providing legal advice. Discussing only one option – the Commonwealth Law program – is not giving legal advice; it's closing a sale. Legal advice for someone who cannot pay his debts would include consideration and discussion of other available options, such as bankruptcy.[24] Both Mr. Scheer and Mr. Wang testified they did not give bankruptcy advice.

Mr. Scheer's services to Mr. Clark consisted of 7 quarterly reviews, which did not involve any communication with Mr. Clark, for each of which he was paid $10.00; two annual reviews, one of which was performed without speaking with Mr. Clark and the other of which involved a telephone call about which Mr. Scheer made no substantive notes, for each of which he was paid $40.00; and 4 settlement reviews, for each of which he was paid $10. The Court cannot find any legal advice was provided in the quarterly reviews or annual reviews. Mr. Scheer had only one conversation with Mr. Clark, during the second annual review, about which he made no notes. For the other reviews, there was no communication between them. An attorney cannot give legal advice without some type of communication with the client.[25]

---

[24] Also, legal advice for someone who is seeking to resolve his debts for less than the amount owed should include some tax-related advice, since canceled debt may be reported to the IRS and may be considered taxable income. There are notable exceptions, such as insolvency (which presumably applied to Mr. Clark at the time) and bankruptcy. *See, e.g.,* IRS Pub. No. 4681, Canceled Debts, Foreclosures, Repossessions, and Abandonments (for Individuals). The Court does not mean to imply Mr. Clark's canceled debt would have been taxable income; the Court merely notes an attorney giving legal advice about debt cancelation should consider whether the canceled debt could be taxable and provide appropriate advice to the client. Commonwealth Law did not do that here and, in fact, expressly excluded such advice from its services.

[25] To be sure, an attorney need not speak or otherwise send or receive messages directly to or from a client in order to communicate with a client. Attorneys can and do rely on other lawyers and on non-lawyers to facilitate client communication. But, the facts of this case do not support a conclusion any facilitated

Further, an attorney cannot give legal advice without considering the client's individual circumstances. Mr. Scheer's notes do not reflect he considered Mr. Clark's individual circumstances when he conducted his quarterly or annual reviews. For example, when Mr. Scheer conducted his first quarterly review of Mr. Clark's file, the notes in the file revealed the existence of a demand letter from Vinci Law Office on behalf of American Express. Mr. Scheer did not appear to inquire further. By the second quarterly review, March 31, 2020, Vinci Law Office had filed a lawsuit and had served Mr. Clark with the summons and complaint. Mr. Scheer did not appear to inquire further. He made the same notes he always made: no lawsuits or other requests had been assigned to him. The American Express lawsuit, which was not specifically assigned to Mr. Scheer (nor was it assigned to any Class B attorney), was not Mr. Scheer's responsibility, not his problem. By the June 30, 2020, quarterly review, Mr. Clark was unemployed. Mr. Scheer made no note of it. By the December 29, 2020, quarterly review, Mr. Clark had missed two monthly payments, resulting in the cancellation of the two settlements Commonwealth Law had obtained to date. Mr. Scheer made no note of it. By the March 29, 2021, quarterly review, Mr. Clark had renegotiated the American Express/Vinci Law Office settlement on his own and was making payments directly to the law firm, and he had also obtained a reset of the Capital One settlement. Mr. Scheer made no note of it. By the December 24, 2021, quarterly review, Mr. Clark's payments had stopped, Commonwealth had flagged Mr. Clark as a "bankruptcy risk," and Mr. Clark had, in fact, filed a bankruptcy petition. Mr. Scheer did not make any attempt to find out whether Mr. Clark was going to file or had already filed a bankruptcy case. He made the same copy-and-paste quarterly review entry he always made, and he received his $10. Perhaps a $10 fee was insufficient to beget a review of the file notes, communication with the client, and consideration of the client's individual circumstances, but those are essential components of legal advice.

The Retainer Agreement specifically provided Commonwealth Law would "discuss and advise Client as to the bankruptcy option, including fees and costs, at any time that Client's circumstances change or Client requests such consultation." Mr. Clark's circumstances changed when he became unemployed, as he informed Commonwealth in early May 2020. Several times over the next 18 months, Mr. Clark specifically asked about bankruptcy, and those questions were reflected in the LeadTrac notes. No Class B attorney discussed bankruptcy with Mr. Clark or advised him as to the bankruptcy option. Unfortunately for Mr. Clark, the only Commonwealth representative who gave him any bankruptcy information[26] was Mr. Percival, a Commonwealth Services customer service representative who was not supervised by a Colorado lawyer. The bankruptcy information Mr. Percival gave was not applicable to Mr. Clark's financial situation and was therefore unhelpful. Mr. Clark did qualify for Chapter 7 relief, and he would not have had to pay back the full amount of the credit card debts he owed under a Chapter 13 plan. Had he

---

communications took place. Communication involves an exchange, a back-and-forth. There was no back-and-forth between the Class B attorneys and the Commonwealth employees who spoke to Mr. Clark.

[26] Mr. Percival gave legal information but not legal advice. He did not tailor the information to Mr. Clark's specific circumstances, which is an essential component of legal advice, as discussed below.

filed a bankruptcy petition in late 2019 instead of participating in Commonwealth's program, Mr. Clark would have saved money.

Finally, the Court cannot find settlement reviews constituted legal advice or legal services. When approving settlements, the attorneys did not review the client file, nor did they consider the client's individual circumstances at the time of settlement. Mr. Scheer approved the Capital One settlement two minutes after the system triggered his review. Mr. Scheer approved the Citi/Radius Global Solutions settlement in November 2021, after Mr. Clark had informed Commonwealth he was "almost busted" and "having to look at bankruptcy options," and shortly before Mr. Clark filed his Chapter 7 petition. Both Mr. Scheer and Mr. Wang testified the criteria for settlement approval was whether it fit within Commonwealth Law's parameters, which required settlements be less than a certain percentage of the debt. Determining whether a settlement falls within Commonwealth Law's parameters may constitute business advice or business services to Commonwealth Law, but it does not constitute legal advice or legal services to the client.

The Court cannot find Commonwealth Law or Commonwealth Servicing met its burden of establishing Mr. Scheer, Mr. Wang, or any other Colorado-licensed attorney provided legal advice or legal services to Mr. Clark. The second element of the legal services exclusion is not satisfied.

### 3.    Were services provided in an attorney-client relationship?

Finally, the Court considers whether Mr. Scheer, Mr. Wang, or any Colorado-licensed Class B attorney had an attorney-client relationship with Mr. Clark.

> Under Colorado law, an attorney-client relationship is based upon contract which may be express or implied from the conduct of the parties. In either case, the parties must agree on all essential terms of the relationship, as evidenced by the parties' manifestations of mutual assent. Whether an attorney-client relationship exists is a question of fact . . . . [T]he party claiming the relationship [] bears the burden of establishing it.

*Int'l Tele-Marine Corp. v. Malone & Assocs., Inc.*, 845 F. Supp. 1427, 1431 (D. Colo. 1994) (citations omitted). Here, the Retainer Agreement specified the relationship between Commonwealth Law and Mr. Clark. Regarding the responsibilities of attorneys, the Retainer Agreement contained the following representations:

- "Attorneys directly supervise the activities they do not directly perform." (Retainer Agreement at 4).

- "Commonwealth will advise and represent Client in their defense of litigation initiated by creditors or collectors to recover debts listed in this Agreement. Commonwealth attorneys are immediately notified of litigation, and may be assigned to address any litigation served on Client after the effective date of this Agreement." (Retainer Agreement at 4).

- "Commonwealth attorneys will supervise all third-party entities to ensure contracted services comply with Commonwealth's rules and regulations." (Retainer Agreement at 4).

- "The Retainer Fee is $1,650. This fee covers the initial work performed by attorneys in crafting and reviewing your specific debt negotiation plan, as well as their continued legal work in securing or approving settlements, counseling you on the phone, providing litigation services, and any other legal tasks your circumstances require." (Retainer Agreement at 7).

- "Commonwealth is a full-service debt resolution law firm which provides services including debt negotiation and restructuring and bankruptcy services." (Retainer Agreement at 23).

Based on those statements, Mr. Clark may reasonably have believed he had an attorney-client relationship with Commonwealth attorneys who were licensed in Colorado and perhaps also physically located in Colorado. When the Vinci Law Office filed a lawsuit against him, Mr. Clark offered to deliver the complaint and summons to "the local lawyer." He believed a Colorado lawyer would review the lawsuit and provide advice. That did not happen. Also, Mr. Clark may reasonably have expected attorneys of a "full-service debt resolution law firm which provides . . . bankruptcy services" to advise him as to the appropriateness of a bankruptcy filing and, if appropriate for him, assist him with that filing. That did not happen.

Not one of the above-listed attorney representations was accurate. Class B attorneys did not supervise the work they did not directly perform. Class B attorneys neither advised nor represented Mr. Clark in defense of the lawsuit Vinci Law Office filed against him. Commonwealth did not immediately notify Class B attorneys about the pendency of the litigation. Class B attorneys did not supervise third-party entities. Class B attorneys did not do any work to craft Mr. Clark's debt negotiation plan (included in the Retainer Agreement), which was already prepared by Mr. Minton, presented by the notary, and signed by Mr. Clark before Mr. Wang was notified to perform the initial client call. Mr. Wang countersigned the Retainer Agreement a week before he spoke to Mr. Clark, which belies any contention he reviewed it with Mr. Clark. Class B attorneys did not secure settlements. As discussed above, their work "reviewing" and approving settlements did not constitute legal services. Class B attorneys did not meaningfully counsel Mr. Clark on the phone, did not provide any litigation services, and did not perform any other legal task Mr. Clark's circumstances required. No Class B attorney provided bankruptcy advice or bankruptcy services to Mr. Clark.

Commonwealth's actions did not support its stated intentions to form an attorney-client relationship, not just in this case, but in the way the program operated overall. The evidence before the Court does not show the manifestation of any attorney-client relationship between the Class B attorneys and the clients. At all times, the Commonwealth Law and Commonwealth Servicing employees did the work, and the

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 22-01166 KHT

Class B attorneys' role was limited to that of a rubber stamp. There was no legitimate attorney-client relationship between Class B attorneys and Commonwealth clients.

As the Colorado Supreme Court held:

The comments to the UDMSA, on which [CUDMSA] was based, even state that the statute's remedial nature mandates vigilance by courts and the Administrator to ensure that persons who meet the definition of a "provider" of debt-management services do not attempt "to evade compliance with the Act by creating a sham relationship between its customers and an attorney." UDMSA, § 2 cmt. 10 (2011); *see also id.* (stating that the exclusion is not applicable "merely because the individual speaks to or enters a nominal agreement with an attorney, if the real intermediary between the individual and the creditors is a person other than the attorney" and that "[m]ere contact with an attorney or an attorney's office does not suffice").

*Coffman v. Williamson*, 348 P.3d at 938 n.5. This Court similarly finds the relationship between Class B attorneys and Commonwealth clients to be sham relationship. The real intermediaries between Mr. Clark and his creditors were the non-lawyer employees of Commonwealth Law and Commonwealth Servicing.

Defendants portray Commonwealth Law as a law firm, as if it were a group of lawyers doing legal work. But, Commonwealth Law was a law firm in name only, a façade.[27] In substance, it was a debt-negotiation firm. The work was done by non-lawyer negotiators and customer service representatives who were not supervised by Class B attorneys. At trial, Defendants justified their business model by arguing clients in Mr. Clark's position could not afford to pay for attorneys' services. But, Mr. Clark deposited $21,765.60 into his GCS Account, $12,297.07 of which was paid to Commonwealth Law. Mr. Clark paid far more to Commonwealth Law than he would have paid a Colorado bankruptcy attorney. It was not attorneys' services, but Commonwealth Law's services that Mr. Clark could not afford.

The Court cannot find Commonwealth Law or Commonwealth Servicing met its burden of establishing Mr. Scheer, Mr. Wang, or any other Colorado-licensed attorney provided legal advice or legal services to Mr. Clark in the context of an attorney-client relationship. The third element of the legal services exclusion is not satisfied.

## C.     Liability and Damages.

As discussed above, Commonwealth Law and Commonwealth Servicing provided debt-management services to Mr. Clark, a Colorado resident, and were therefore subject to CUDMSA. When Mr. Clark filed his bankruptcy petition, his property, including rights and causes of action under CUDMSA, became property of his estate, pursuable and

---

[27] If Commonwealth Law were a law firm, its fee-sharing agreements with Commonwealth Servicing would have violated Rule 5.4 of the Colorado Rules of Professional Conduct.

34

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 22-01166 KHT

recoverable by Trustee under 11 U.S.C. § 541(a). CUDMSA provides for a private right of action, including compensatory damages, trebled or punitive damages, and reasonable attorney fees and costs.

Under CUDMSA:

(a)     If a provider imposes a fee or other charge or receives money or other payments not authorized by section 5-19-223 or 5-19-224, the individual may void the agreement and recover as provided in section 5-19-235.

(b)     If a provider is not registered as required by this part 2 when an individual assents to an agreement, the agreement is voidable by the individual.

Colo. Rev. Stat. Ann. § 5-19-225(a)-(b). Here, both sections apply, and the Court will consider each in turn.

### 1.     § 5-19-225(a)

Section 5-19-225(a) allows Trustee to void the Retainer Agreement and recover under § 5-19-235 if the Defendants violated § 5-19-223, which, in turn, provides as follows:

(a)     A provider may not impose directly or indirectly a fee or other charge on an individual or receive money from or on behalf of an individual for debt-management services except as permitted by this section.

(b)     A provider may not impose charges or receive payment for debt-management services until the provider and the individual have signed an agreement that complies with sections 5-19-219 and 5-19-228.

Colo. Rev. Stat. Ann. § 5-19-223(a)-(b). And, § 5-19-219 requires that each agreement disclose the following (in relevant part):

(A)     The services to be provided;
(B)     In a clear and conspicuous manner, the amount, percentage, or method of determining the amount, of all fees, individually itemized, to be paid by the individual, using only the terminology contained in section 5-19-223;
(C)     The schedule of payments to be made by or on behalf of the individual, including the amount of each payment, the date on which each payment is due, an estimate of the date of the final payment, and an estimate of the total of all payments to be made under the plan;
(D)     In a clear and conspicuous manner, the following information:

35

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 22-01166 KHT

      (i)     The amount of time necessary to achieve the represented results;

      (ii)    If the plan includes a settlement offer to any of the individual's creditors or debt collectors, the time by which the provider will make a bona fide settlement offer to each of them and the amount of money or the percentage of each outstanding debt that the individual must accumulate before the provider will make a bona fide settlement offer to each of them; and

      (iii)   If the provider requests or requires the individual to place funds in an account at an insured financial institution, that the individual owns the funds held in the account, the individual may withdraw from the plan at any time without penalty, and, if the individual withdraws, the individual must receive all funds in the account, other than funds earned by the provider in compliance with section 5-19-222(h);

(E)    If a plan provides for regular periodic payments to creditors:

      (i)     Each creditor of the individual to which payment will be made, the amount owed to each creditor, and any concessions the provider reasonably believes each creditor will offer; and

      (ii)    The schedule of expected payments to each creditor, including the amount of each payment and the date on which it will be made;

(F)    If the provider holds money on behalf of the individual, each creditor that the provider believes will not participate in the plan and to which the provider will not direct payment;

(G)   How the provider will comply with its obligations under section 5-19-227(a);

(H)   If the provider holds money on behalf of the individual, that the provider may terminate the agreement for good cause, upon return of unexpended money of the individual;

(I)    That the individual may cancel the agreement as provided in section 5-19-220;

(J)    That the individual may contact the administrator with any questions or complaints regarding the provider; and

(K)   The address, telephone number, and internet address or website of the administrator.

Colo. Rev. Stat. § 5-19-219(a)(6). Here, the Retainer Agreement did not comply with § 5-19-219(a)(6). At a minimum, the Retainer Agreement did not include the information required by § 5-19-219(a)(6)(J)-(K).[28]

---

[28] Given this finding and conclusion, the Court need not determine whether the Retainer Agreement complied with the other requirements of § 5-19-219. Further, the Court need not determine whether Defendants complied with other requirements of CUDMSA. Specifically, at this time, the Court makes no findings or conclusions as to whether Defendants committed any of the prohibited acts and practices set forth in § 5-19-228, although it appears they did. For example, it appears Defendants misrepresented Commonwealth Law was authorized or competent to furnish legal advice or perform legal services, in violation of § 5-19-228(a)(12).

The Retainer Agreement did not comply with § 5-19-219. Because Defendants collected money from Mr. Clark (charges imposed and payments received) without compliance with § 5-19-219, they violated § 5-19-223. Because Defendants violated § 5-19-223, Trustee may void the agreement under § 5-19-225(a) and recover as provided in § 5-19-235, which provides as follows:

> (b)   If an individual voids an agreement pursuant to section 5-19-225(a), the individual may recover in a civil action three times the total amount of the fees, charges, money, and payments made by the individual to the provider, in addition to the recovery under subsection (c)(4) of this section.

> (c)   Subject to subsection (d) of this section, an individual with respect to whom a provider violates this part 2 may recover in a civil action from the provider and any person that caused the violation:

> . . .

> (4)   Reasonable attorney fees and costs.

Colo. Rev. Stat. § 5-19-235(b),(c)(4).

Applying that law to the facts of this case, Mr. Clark deposited $21,765.60 into his GCS Account. Three times that amount is $65,296.80. Under Colo. Rev. Stat. § 5-19-235(b), Trustee is entitled to recover $65,296.80 from both Commonwealth Law and Commonwealth Servicing, jointly and severally, plus reasonable attorney fees and costs, which the Court will award upon the filing of an appropriate application.

### 2.   § 5-19-225(b)

Section 5-19-225(b) allows Trustee to void the Retainer Agreement because neither Commonwealth Law nor Commonwealth Servicing was registered with the state of Colorado. CUDMSA provides for damages, as follows:

> (a)   If an individual voids an agreement pursuant to section 5-19-225(b), the individual may recover in a civil action all money paid or deposited by or on behalf of the individual pursuant to the agreement, except amounts paid to creditors, in addition to the recovery under subsections (c)(3) and (c)(4) of this section.

> (c)   Subject to subsection (d) of this section [pertaining to class action recoveries], an individual with respect to whom a provider violates this part 2 may recover in a civil action from the provider and any person that caused the violation:

> . . .

37

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 22-01166 KHT

(3) Punitive damages; and

(4) Reasonable attorney fees and costs.

Colo. Rev. Stat. § 5-19-235(a),(c).

Mr. Clark deposited $21,765.60 into his GCS Account. Of that amount, $8,064.13 was paid to the holders of the five enrolled debts, and $912.65 was refunded to Mr. Clark. By the Court's calculations, the remaining amount damages is $12,788.82.[29] Trustee neither requested nor proved an appropriate amount of punitive damages. Thus, under Colo. Rev. Stat. § 5-19-235(a), Trustee is entitled to recover $12,788.82 from both Commonwealth Law and Commonwealth Servicing, jointly and severally, plus reasonable attorney fees and costs, which the Court will award upon the filing of an appropriate application.

## V.    CONCLUSION

For the reasons discussed above, the Court finds both the Law Offices of Amber Florio, PLLC d/b/a Commonwealth Law Group and Commonwealth Servicing Group, LLC provided debt-management services to Mr. Clark, a Colorado resident, in violation of CUDMSA.

Under Colo. Rev. Stat. § 5-19-235(b), Trustee is entitled to recover $65,296.80 from both the Law Offices of Amber Florio, PLLC d/b/a Commonwealth Law Group and Commonwealth Servicing Group, LLC, jointly and severally, plus reasonable attorney fees and costs, which the Court will award upon the filing of an appropriate application.

In the alternative, under Colo. Rev. Stat. § 5-19-235(a), Trustee is entitled to recover $12,788.82 from both the Law Offices of Amber Florio, PLLC d/b/a Commonwealth Law Group and Commonwealth Servicing Group, LLC, jointly and severally, plus reasonable attorney fees and costs, which the Court will award upon the filing of an appropriate application.

A separate judgment shall enter.

Dated March 31, 2026                    BY THE COURT:

                                        Kimberley H. Tyson
                                        United States Bankruptcy Judge

---

[29] The Court interprets CUDMSA as requiring the Court to subtract the amounts Commonwealth paid to Mr. Clark's creditors from the amount of damages awarded under § 5-19-235(a). The Court further finds the amount refunded to Mr. Clark should be subtracted from the amount of damages awarded. The Court does not interpret CUDMSA as requiring the Court to subtract the GCS service charges from the amount of damages recovered. Thus, the amount of compensatory damages under § 5-19-235(a) is the amount paid to Commonwealth Law plus the GCS service charges.

38